*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
May 30, 2024

*In re* L. JAMESON, Minor.

No. 368074
Kalamazoo Circuit Court
Family Division
LC No. 2020-000087-NA

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

In this child-protective proceeding, respondent-mother appeals of right the trial court order terminating her parental rights to her minor child, LJ. The trial court found that termination was warranted under MCL 712A.19b(3)(c)(*ii*), (g), and (j). On appeal, respondent contends that the Department of Health and Human Services (DHHS) failed to provide her with reasonable services designed to reunify her with LJ, and she suggests the DHHS and the trial court should have taken additional steps to accommodate her learning disability. She also asserts that the trial court clearly erred when it found that grounds for termination existed. We affirm.

## I. FACTUAL BACKGROUND

On March 9, 2020, a petition was filed concerning respondent's minor child, LJ, when her child was 11 months old. That petition alleged that respondent had three outstanding warrants for her arrest, her home was cluttered with drug paraphernalia within reach of her minor children, both methamphetamine and marijuana were being used in the home in the presence of the children, and there were no "safe sleeping arrangements" for LJ. LJ's father also was a respondent in the case, but he has not appealed the termination of his parental rights. After the petition was filed, LJ and respondent's ten-year-old son, SL,[1] were removed from the home. Because no relative was found to be a viable placement option, LJ and SL were placed by the DHHS.

---

[1] SL's father was sent to prison after he pled guilty to second-degree murder. He is not a party to this appeal. Additionally, respondent has older children who were in the custody and care of their father and are not subjects of this appeal.

Respondent was ordered to participate in a psychological evaluation. Respondent told Dr. Randall Haugen that she was enrolled in special education during high school, but she claimed she had no real problems—she was just drinking and taking prescription pills at the time. Additionally, respondent explained that she used marijuana every day and methadone when she could get it, and she had used methamphetamine and heroin, too. Respondent's IQ was at the lower end of the low average range and she lacked insight into her drug problem. Dr. Haugen recommended supervised parenting time and continued drug screenings.

During a dispositional hearing in October 2020, the trial court noted that both parents were doing well with visitation, but they struggled with positive drug screens. The trial court suggested family-dependency treatment court and warned respondent that the lack of progress in six months would not be regarded favorably. As the case progressed, respondent began to produce clean drug screens, she had appropriate housing, and she was loving and affectionate with the children. Her parenting skills and interactions with the children were exceptional. Respondent's only flaw was that she had not fully participated in substance-abuse treatment. The children were doing well in their respective placements, but respondent could begin having unsupervised parenting visits.

In July 2021, respondent gave birth to a son, JJ, who suffered from withdrawal symptoms when he was born and required treatment, but respondent attributed JJ's withdrawal to prescription medication. On August 20, 2021, the DHHS petitioned to have JJ placed into care. The trial court authorized the petition, but placed JJ with respondent. Then respondent started having overnight visits with LJ and SL as well. Respondent maintained her sobriety, but she felt overwhelmed with all three children, especially when they were all with her overnight.

At a hearing on June 29, 2022, the lawyer-guardian ad litem recommended moving toward termination of respondent's parental rights. The trial court did not agree to authorize a termination petition, but the court was at a loss for words when it contemplated that respondent was still feeling overwhelmed after two years and three months of services. Nevertheless, the trial court continued the placement and plan for the time being, but it made clear that there should be no overnights. By September 2022, the trial court found that the time had come to change the goal from reunification to adoption in hopes that the parents would show significant progress before termination.

On December 15, 2022, the DHHS filed a petition for termination of respondent's parental rights to LJ and SL, alleging that termination was appropriate under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*), MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j). The DHHS acknowledged that respondent had substantially complied with services involving her substance abuse and mental stability and had appropriate housing. But the DHHS asserted that respondent had failed to ensure that the children received proper care.

At the beginning of the termination hearing on April 27, 2023, respondent stated that she wanted to seek a juvenile guardianship for SL, who had been placed with his paternal grandmother and step-grandfather, and that placement appeared to be going very well. The trial court adjourned the termination hearing as to SL, but proceeded with the termination hearing for LJ. The trial court conducted the termination hearing concerning LJ on April 27, 2023, June 8, 2023, August 9, 2023, and August 17, 2023.

On April 27, 2023, foster-care worker Kenya Boyd testified about her involvement in the case from June 2020 until October 2022. Boyd returned to the witness stand on June 8, 2023, and completed her testimony. Next, respondent testified on June 8, 2023. On August 9, 2023, foster-care worker Amber Hamilton testified about her involvement in the case from October 2022 until May 2023. In addition, foster-care worker Tyreanna Odren testified about her involvement in the case beginning in February 2023. Finally, Christina Sabbia—LJ's foster parent—testified briefly on August 9, 2023, and then completed her testimony on August 17, 2023. On that same date, the trial court rendered its findings and terminated respondent's parental rights to LJ based upon MCL 712A.19b(3)(c)(*ii*), (g), and (j). Respondent thereafter filed this appeal of right.

## II. LEGAL ANALYSIS

On appeal, respondent asserts that the DHHS did not put forth reasonable efforts towards reunification that were compatible with the accommodations necessary for her learning disability. In addition, respondent contends that the trial court erred in finding that termination was warranted under MCL 712A.19b(3)(c)(*ii*), (g), and (j). We will address each of these arguments in turn.

## A. REASONABLE EFFORTS

Respondent criticizes the trial court for failing to order the DHHS to offer her additional accommodations, as required under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, to address her learning disability. To preserve that challenge premised on the adequacy of the services provided by the DHHS, respondent had to object to the case service plan or assert that the plan was inadequate either when the court adopted the case service plan or during a subsequent hearing to update the case service plan. See *In re Atchley*, 341 Mich App 332, 336-338; 990 NW2d 685 (2022). Likewise, a claim that the DHHS failed to make accommodations consistent with the ADA had to be raised in a timely manner. *In re Terry*, 240 Mich App 14, 26 n 5; 610 NW2d 563 (2000). Respondent never objected to the case service plan, nor did she ever state that she had a disability within the contemplation of the ADA that required accommodations. Therefore, she did not preserve her claim of error for appellate review. See *In re Atchley*, 341 Mich App at 336-338; *In re Terry*, 240 Mich App at 26 n 5.

The DHHS, citing *In re Terry*, 240 Mich App at 26 n 5, argues that respondent waived her claim of error by failing to raise it before the termination hearing began. In that ruling, this Court stated that, "[a]ny claim that the parent's rights under the ADA were violated must be raised well before a dispositional hearing regarding whether to terminate her parental rights, and the failure to timely raise the issue constitutes a waiver." *Id.* Our Supreme Court has recognized a distinction between waiver, which is a voluntary relinquishment of a known right, and forfeiture, which is the failure to timely assert a right. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). This Court further noted that courts have not always used the terms with precision. See *People v Vaughn*, 491 Mich 642, 663 n 74; 821 NW2d 288 (2012). This Court referred to the failure to timely assert the right to accommodations as a waiver in *In re Terry*, but it is apparent that this Court was confronted with a failure to timely assert the right, which amounted to a forfeiture, not a waiver. See *Carter*, 462 Mich at 215. Moreover, this Court has ruled that the plain-error standard of review applies in cases involving termination of parental rights. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). Therefore, respondent's failure to timely assert her claim of error constitutes forfeiture, not waiver, so we will undertake plain-error review. A plain error only

-3-

warrants relief on appeal if the plain error affected the outcome of the proceedings or affected the fairness, integrity, or public reputation of the proceedings. *Id.* at 9.

The DHHS had to expend reasonable efforts to reunify respondent with LJ before seeking the termination of respondent's parental rights. See *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). To that end, the DHHS created a case service plan that included a schedule of services to be provided to respondent to help her overcome the barriers to reunifying her with LJ. See *id.* at 85-86. When providing services, the DHHS had to give respondent a reasonable time to make changes and benefit from the plan. See *In re Mason*, 486 Mich 142, 159; 782 NW2d 747 (2010). Additionally, "efforts at reunification cannot be reasonable under the Probate Code if the DHHS has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks*, 500 Mich at 86. A parent must participate in the services that are offered and demonstrate that he or she adequately benefited from the services. See *In re Atchley*, 341 Mich App at 339. When challenging the adequacy of the DHHS's accommodations, a parent must show that he or she would have fared better with accommodations. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005).

Here, a psychologist, Dr. Randall Haugen, evaluated respondent and his report was the first indication that respondent may have needed additional accommodations as part of her case service plan. Dr. Haugen indicated that respondent's testing placed her at below average in verbal skills, average in nonverbal skills, and below average for her composite IQ. On the basis of those scores, Dr. Haugen diagnosed respondent with "Low Average/Borderline Intellectual Functioning." Dr. Haugen wrote that it would be appropriate to provide respondent with "[d]irect training in the area of abuse and neglect" along with her partner, who was LJ's father. He also recommended that the DHHS ensure that respondent had a "good understanding of what abuse and neglect [was] and the impact of their behavior on a child." But Dr. Haugen did not opine that respondent was disabled, and he did not specifically address any special accommodations that respondent might require in light of her test results. Consequently, Dr. Haugen's report did not place the DHHS on notice that respondent had some intellectual limitations that required particular accommodations.

Respondent initially raised the issue of her learning disability in December 2022, when her lawyer asked a caseworker whether she knew that respondent had applied for disability income on the ground that she had a learning disability. The caseworker stated that that was the first time she had learned that respondent had applied for disability income. Subsequent testimony revealed that respondent was not approved for Social Security disability benefits, and the trial court specifically found that respondent was capable of working. Accordingly, whatever intellectual limitations that respondent might have had did not support the conclusion that she was permanently disabled from working.

There was testimony that respondent's intellectual limitations were not so pronounced that she required extra services or special accommodations beyond a better explanation of the services and the requirements of the case service plan. For example, Kenya Boyd worked with respondent on the case service plan. Boyd agreed that respondent had some sort of learning disability. Boyd stated that she often had to explain things to respondent a little more. Nevertheless, Boyd testified that respondent knew how to take advantage of resources that were made available to her and did take advantage of them when she was motivated to do so.

Respondent testified similarly, stating that she had a learning disability and, as a result, she sometimes asked questions to "get a better understanding" from the caseworkers. But respondent agreed that the caseworkers went over everything with her, and she did not feel that anything was out of the ordinary or unusual. She agreed that she sometimes needed things explained just a little more carefully, and she also agreed that the workers did just that for her.

There was also evidence that LJ's foster mother provided respondent with accommodations to help her develop the ability to manage her children's medical and mental-health care. The foster mother texted, called, and e-mailed respondent about appointments. The foster mother also helped respondent set up a medical app on her phone so that respondent would get notifications and could schedule appointments more easily. The foster mother provided respondent with similar assistance concerning school.

The record also reveals that the DHHS provided respondent with numerous services that were reasonably calculated to help her overcome the barriers to reunification. A caseworker noted that respondent needed prompting to schedule appointments, so the worker helped respondent with time management and scheduling. The DHHS provided respondent with individual counseling, substance-abuse counseling, and couples counseling through the Building Resiliency in Substance Abuse program. The DHHS furnished her with drug testing and treatment to help her overcome her problems with substance abuse. The DHHS worked with her on parenting visits and gradually increased them to include unsupervised visits and overnight visits, and a support worker would go over the visits with respondent. The DHHS provided respondent with a parenting class and classes designed to help her understand how to care for her newborn son and children, which included in-home visits and training. The DHHS gave her a bus pass and helped ensure that her appointments were all along bus lines. The DHHS set her up with a drop-in center to allow respondent to arrange for childcare when she participated in services. The DHHS fashioned safety plans that helped her understand the tasks she needed to perform to help her children stay safe. A caseworker ultimately opined that the DHHS had exhausted all the services that were available to respondent in the three years that LJ was in foster care.

Respondent has not identified any additional services or accommodations that she believes might have benefited her. She only asserts that she needed more time despite the passage of three years from LJ's initial removal. Respondent's assertion does not meet her burden to show that she would have done better had she been accommodated. See *In re Fried*, 266 Mich App at 543. On this record, it appears that the DHHS provided respondent with whatever modifications she needed to benefit from her case service plan. Respondent has not established that the trial court committed plain error by failing to order the DHHS to provide additional services or accommodations aimed at addressing respondent's learning disability. See *In re Utrera*, 281 Mich App at 8-9. Therefore, the trial court did not commit reversible error under the plain-error standard when it found that the DHHS made reasonable efforts to reunify respondent with her child.

## B. STATUTORY GROUNDS

Respondent next claims the trial court erred by finding that clear and convincing evidence supported the termination of her parental rights under MCL 712A.19b(3)(c)(*ii*), (g), and (j). Those provisions state as follows:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . .

* * *

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). In reviewing a trial court's decision, we must "give due regard to the trial court's special opportunity to observe the witnesses." *In re Dearmon*, 303 Mich App 684, 700; 847 NW2d 514 (2014) (quotation marks and citation omitted). When we conclude that the trial court did not clearly err in finding one ground for termination, we need not address any additional grounds. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). Here, we conclude that the trial court did not clearly err in relying on MCL 712A.19b(3)(c)(*ii*) as a basis for terminating respondent's parental rights, so we shall not consider the other grounds identified by the trial court in its termination decision.

Pursuant to MCL 712A.19b(3)(c)(*ii*), the trial court can terminate parental rights if it finds that "[o]ther conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable

opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Here, the trial court found that there were new conditions that caused LJ to come within the court's jurisdiction, that respondent received services to help rectify those conditions, that she did not rectify those conditions, and that there was no reasonable likelihood that she would rectify those conditions within a reasonable time in light of LJ's age. Specifically, the trial court identified respondent's weak parenting skills, her continued dysfunctional relationship with her partner, and the conditions of her home.

Testimony and other evidence showed respondent struggled with managing her children's needs as the DHHS began to schedule more parenting time and overnight visits. Respondent had a difficult time getting her son, SL, to take medications, to do his homework, and to perform basic hygiene functions. Respondent acquiesced to SL's preferences and claims about his homework. SL's foster mother testified that SL likewise did not want to perform those tasks at his foster home, so she provided structure for SL and then he engaged with the routine. The evidence revealed that SL regressed when he stayed with respondent because there was no structure. Her home, as one caseworker stated, was chaotic and inconsistent. SL had already fallen behind in school, reading at a kindergarten level at age 10 when he came into care, and he had only made up lost ground as a result of intense intervention and the structure that he had at his foster home.

Additionally, respondent struggled to manage all her appointments and SL's appointments. Respondent testified that she had to handle four appointments each week—including her own and her son's appointments—when she had him in her care. But the evidence revealed that respondent did not work or attend school. Hence, all she had to do was care for the children when they were with her and engage in services. Even though she was not working, respondent felt overwhelmed in managing four weekly appointments. Respondent failed to schedule appointments and to ensure SL attended his appointments, despite being reminded by the foster mother and having an app with reminders. SL missed so many appointments when respondent was in charge of scheduling them that his doctor dropped him as a patient.

The evidence revealed that LJ had developmental delays when she first came into foster care and that she benefited from the extra attention and structure of the foster home. The evidence that respondent neglected SL's needs indicated that respondent would similarly neglect the needs of LJ as she matured, placing LJ at risk for the same kinds of regression that SL suffered while in respondent's care. See *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (stating that how a parent treats one child is probative of how that parent may treat a different child). Evidence also showed that respondent had a dysfunctional relationship with her partner, who continued to struggle with the use of alcohol and methamphetamine after being instructed to stop using both and being provided services to help him stay sober. There was also testimony that his behavior was problematic whenever he consumed alcohol. During one incident involving alcohol, he and respondent argued, and respondent tried to lock him out of the apartment. He kicked in the door, which struck respondent in the head, causing a serious gash.

Respondent's partner posed such a danger to the children that the trial court instructed him to stop living in respondent's apartment. Despite that order, respondent permitted him to continue staying in the apartment. Respondent's claims to the contrary were not credible, especially because her partner told a caseworker he was staying with respondent. The testimony further showed that, although respondent knew that she needed to learn how to live and parent on her own, she refused

to do so. Respondent consistently blamed her partner for the conditions that made it unsafe for the children in her home. Specifically, she blamed him for not aiding her with the children's care, but she also told caseworkers that she needed him in her life because she required his help to keep her from being overwhelmed by the children's needs. There was also evidence that he and respondent frequently argued. Thus, the totality of the evidence strongly suggested that respondent would put her emotional need to continue the dysfunctional relationship with her partner over her children's need for safety and stability.

Evidence revealed that respondent struggled to maintain her living space. Her apartment was infested with roaches. Although respondent blamed the apartment complex for the problem, there was testimony that the apartment-complex staff had taken steps to resolve the infestation— spraying the apartment more than two dozen times—but the dirty conditions of the apartment had undermined the steps taken. There was testimony that respondent left piles of dirty dishes in the sink and throughout the kitchen. She also allowed bags of trash to remain in the home, rather than taking them out to a dumpster. Evidence revealed that her apartment looked like a hoarder's home. Indeed, the apartment-complex manager had threatened to evict her.

To her credit, respondent made dramatic improvement on her sobriety, but respondent did not demonstrate that she had adequately benefited from the services designed to help her with her parenting skills, relationship issues, and the cleanliness of her home. See *In re Atchley*, 341 Mich App at 339. The record permitted inferences that respondent would become easily overwhelmed by routine matters and that she would also likely fail to enforce the kind of structure that LJ needed as she developed. Indeed, the record supported a finding that respondent would neglect LJ's needs in the same way that she neglected SL's needs, which risked regression in LJ's development. She would also likely continue to place her personal desire to be in a relationship with her partner over the need to protect LJ from the dangers her partner posed when using alcohol or methamphetamine. That would also create an emotionally unstable environment for respondent, which complicated her ability to care for LJ. The evidence indicated that she would further fail to maintain a safe and clean household. Although no one specific finding, when viewed in isolation, demonstrated that respondent neglected LJ, the record, when reviewed as a whole, supports the trial court's finding that respondent failed to rectify other conditions that amounted to neglect sufficient to support the trial court's order of termination under MCL 712A.19b(3)(c)(*ii*). Consequently, the trial court did not err by terminating respondent's parental rights to LJ under MCL 712A.19b(3)(c)(*ii*). See *In re HRC*, 286 Mich App at 461.[2]

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra

---

[2] Respondent does not contend that the trial court erred in finding that termination of her parental rights was in LJ's best interests. Therefore, we may presume that the trial court did not clearly err by finding that termination of respondent's parental rights was in the child's best interests. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo Minors*, 462 Mich 341; 612 NW2d 407 (2000).